IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ARTURO MONTES, JR.,<br>Defendant. | 2:26-CR-037-Z-BR-(1) |

# MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Arturo Montes' ("Montes") Motion to Suppress ("Motion") (ECF No. 25), the Government's Response ("Response") (ECF No. 26), Defendant's Reply ("Reply"), the Government's Supplemental Response (ECF No. 36), and the Defendant's Supplemental Reply (ECF No. 37). Defendant moves to suppress evidence stemming from a traffic stop and car search. He argues the stop violated his Fourth Amendment rights under the U.S. Constitution by subjecting him to an unreasonable seizure. For the reasons stated below, the Court **DENIES** the Motion.

## BACKGROUND

At times a thin line separates a reasonable stop from an unreasonable one. Here, that line is more than a mere metaphor—the issue turns on the existence of an *actual* line. On March 20, 2026, driver Arturo Montes took Exit 96 off eastbound I-40 and approached the intersection ("The Intersection") of State Highway 207 and the I-40 frontage road.[1] ECF No. 41 at 15. Trooper Alexandrea Moroles followed in her patrol vehicle. *Id.* at 12. After exiting, Montes signaled his intent to turn left at The Intersection. He made a complete stop atop a partially faded stop line. Finally, he executed the turn. ECF No. 39, Pl. No. 1 at 1:15–1:40

[1] The facts recounted herein reflect the Court's factual findings for the limited purpose of ruling on Defendant's evidentiary objection.

("Ex. 1"). Trooper Moroles observed these events from behind. Shortly thereafter, she stopped Montes in a nearby gas station parking lot and informed him of his failure to stop behind a stop line, in violation of Texas law. *See* ECF No. 41 at 22–25.

Montes merely received a warning for the stated traffic violation, but during the stop he consented to a search of his vehicle. ECF No. 26 at 2. That search yielded a large quantity of suspected narcotics. *See id.* On March 26, 2026, an Indictment charged Defendant with Conspiracy to Distribute or Possess with Intent to Distribute 400 Grams or More of Fentanyl, in violation of 21 U.S.C. Section 846, and Possession with Intent to Distribute 400 Grams of More of Fentanyl, in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A)(vi). ECF No. 17. Montes now seeks to suppress the evidence obtained pursuant to the traffic stop and subsequent search. *See* ECF No. 25. After receiving briefing from the parties, the Court held an in-person hearing on July 9, 2026. There, the Court heard testimony from Trooper Alexandrea Moroles and Investigator Marisol Castanon regarding the events of March 20, 2026, including the state of The Intersection where those events occurred. The testimony, which the Court deems credible, reflects the following.

*The Stop Line*

Trooper Moroles regularly patrolled the area where Montes's stop occurred. She knew the stop sign at The Intersection of State Highway 207 and the I-40 frontage road included a white stop line. *See* ECF No. 41 at 28. She estimated she has interdicted more than 50 vehicles for failing to properly stop at The Intersection. *Id.* And she knew other officers regularly did the same, even in the weeks preceding March 20, 2026. *Id.* at 29.

Not long before March 20, 2026, Trooper Moroles recognized The Intersection's stop line was deteriorating. *Id.* at 28. Still, she thought it remained visible to approaching vehicles. *Id.* at 21. Throughout her testimony, she maintained the line was visible on March

20, 2026. *Id.* at 40. She testified that she could see the stop line as she drove along the curve approaching The Intersection. *Id.* at 35. She also testified she could see the line as Montes's vehicle moved forward into The Intersection. She could see that his vehicle stopped on top of it, with the front "approximately half a car length past the line." *Id.* at 21.

After March 20, 2026, the line continued to deteriorate, though the pace of its deterioration remains uncertain. On April 22, 2026, approximately one month after the stop, Investigator Marisol Castanon viewed The Intersection and took photographs. *Id.* at 58. Those photographs showed no visible line from 100 feet away, visible white paint from 50 feet away, and a clear view of a parially-deteriorated white line from 10 feet away. *Id.* at 28–29.

By mid-to-late June, the line's visibility became far worse. In the months after the stop, it "had deteriorated completely," prompting Trooper Moroles to call the Texas Department of Transportation. *Id.* at 29. She notified the agency of the stop line's disrepair, telling them it "had completely gone away" to the point that it "wasn't a line anymore." *Id.*

These various snapshots show the following. First, The Intersection's stop line was noticeably faded on March 20, 2026, but still visible to Trooper Moroles during the events prior to the traffic stop. Second, the line likely deteriorated further between March 20 and April 22, but it remained visible from at least 50 feet away. Finally, the rate of decay left no visible line by mid-to-late June. This timeline informs the Court's findings on the status of the stop line on the date of Montes's traffic stop.

*The Turn Signal*

Prior to the stop, Trooper Moroles also believed Montes failed to signal his turn at least 100 feet in advance of The Intersection. *Id.* at 15–16. When Montes initiated his turn signal, he was driving along the curved road approaching The Intersection. *See* Ex. 1 at 1:21.

As Officer Moroles followed, the road's curvature affected her view of the exact distance between Montes and The Intersection. *Id.*; ECF No. 41 at 101. Montes's brake lights were also illuminated during his approach to The Intersection, somewhat obscuring the initiation of his turn signal. *See* Ex. 1 at 1:21; ECF No. 41 at 101. Based on her observations, specifically her belief that Montes had failed to stop before the stop line and failed to signal his turn at least 100 feet in advance, Officer Moroles executed the traffic stop. During the stop, she only communicated one violation to Montes—his failure to stop behind the stop line. ECF No. 41 at 27. Trooper Moroles testified to the typicality of this practice:

> Q: Now, do you always put every violation on a ticket or warning?
>
> A: No, ma'am.
>
> Q: Why is that?
>
> A: We don't like to stack a whole bunch of warnings. In this case, this one was more of a clean-cut violation to me, so I went ahead and went with that violation.

*Id.* at 26. While Trooper Moroles only communicated one apparent violation, *both* supported her decision to perform the stop. *Id.* at 27.

After learning about the Trooper's second basis for the stop, Investigator Castanon visited The Intersection again. Cross-referencing the footage from Trooper Moroles's dashcam, she marked the approximate point at which Montes began to signal his intent to turn. *Id.* at 61–62. She also marked a point 100 feet from The Intersection for comparison. *Id.* at 64. Those markings appear in Defendant's Exhibit 11. According to Investigator Castanon's estimation, Montes signaled his turn approximately 122.5 feet away from The Intersection. *Id.* at 63. The Government does not contest the accuracy of that estimate.

Ultimately, Trooper Moroles's observations of Montes's alleged failures to adequately stop and signal led to the traffic stop on March 20, 2026. The traffic stop led to a consent-based search of Montes's vehicle, yielding suspected narcotics. Montes now moves to suppress

all evidence obtained during the search. He does not contest the lawfulness of the search, but only that of the initial traffic stop, from which the search derived. *See* ECF No. 25 at 4–5.

**LEGAL STANDARD**

The Supreme Court holds that when law enforcement violates a defendant's Fourth Amendment rights, the remedy is to exclude the wrongfully obtained evidence. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).[2] The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. A traffic stop constitutes a seizure and therefore implicates a defendant's Fourth Amendment rights. *See United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).

Defendant seeks to suppress evidence obtained from a search of his vehicle during the traffic stop. Though he does not challenge the search itself—to which he consented—he argues the stop was unlawful at its inception. A search following an illegal stop typically inherits the stop's defect.[3] *See, e.g., United States v. Granado*, 302 F.3d 421, 424 (5th Cir. 2002) ("Because the stop was unreasonable, the resulting search and seizure were also unreasonable."). Thus, an illegal stop warrants the suppression of evidence obtained during

[2] *Wolf v. Colorado* incorporated the Fourth Amendment against the states and their agents through the Fourteenth Amendment. 338 U.S. 25, 27–28 (1949) ("The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause."). Roughly a decade later, the Court further incorporated the exclusionary rule against the states. *See Mapp*, 367 U.S. at 655 ("Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government.").

[3] This is not the case, however, when a "break in the chain of events" occurred that is "sufficient to refute the inference that the evidence was the product of the Fourth Amendment violation." *Granado*, 302 F.3d at 424 (citing *Brown v. Illinois*, 422 U.S. 590, 602–04 (1975)). In other words, suppression is not required when the search is sufficiently *attenuated* from the illegal stop. Attenuation depends on the totality of the circumstances. *Id.* But neither party raised attenuation in this case. And the Court need not reach it to rule on Defendant's Motion, given the Court's findings and conclusions regarding the lawfulness of the initial stop.

a subsequent search because such evidence is "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

While a defendant generally bears "the burden of proving, by a preponderance of the evidence, that the Government obtained the evidence in question in violation of his constitutional rights," that burden shifts to the Government when its agents conduct a warrantless search or seizure. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Trooper Moroles stopped Montes and searched the car without a warrant. *See generally* ECF Nos. 25, 26. Therefore, the Government must prove, "by a preponderance of the evidence, that the . . . seizure was constitutional." *Id.*

**ANALYSIS**

The Fourth Amendment permits brief warrantless seizures upon reasonable suspicion of illegal activity. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). That rule encompasses traffic stops. *See Grant*, 349 F.3d at 196 ("Because traffic stops are considered more similar to investigative detentions than formal arrests," the Fifth Circuit "analyze[s] the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*"). The *Terry* test "is a two-tiered reasonable suspicion inquiry." *Id.* It asks (1) "whether the officer's action was justified at its inception," and (2) "whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." *Id.* (citing *Terry*, 392 U.S. at 19–20).

## I. Witnessing apparent traffic violations gave Trooper Moroles reasonable suspicion to conduct a traffic stop.

Here, Defendant only challenges the legality of the initial traffic stop, which means only the first *Terry* inquiry applies: whether the stop was "justified at its inception." *Id.*; ECF No. 25 at 1–3. Again, the Fifth Circuit, "following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as

*Terry* stops." *Brigham*, 382 F.3d at 506. While probable cause certainly justifies a traffic stop, so does an officer's "reasonable suspicion" that a violation occurred.[4]

Reasonable suspicion exists when an officer has a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In other words, when "specific and articulable facts, which, taken together with rational inferences from those facts," indicate that a criminal activity is afoot, a brief detention is justified under *Terry*. *Lopez-Moreno*, 420 F.3d at 430. While a "mere hunch will not suffice," it is "clear, however, that reasonable suspicion need not rise to the level of probable cause." *Id.* In determining whether reasonable suspicion existed, courts must give "due regard to the experience and training of the law enforcement officers." *Brigham*, 382 F.3d at 507.

Here, Trooper Moroles stated she witnessed two apparent violations: first, a failure to stop behind a clearly marked stop line—a violation of Texas Transportation Code Section 544.010(c);[5] and second, a failure to signal 100 feet in advance of a turn—a violation of Texas

[4] While some appellate courts have disagreed over the exact contours of stops supported by reasonable suspicion as opposed to probable cause, *see, e.g.*, *Brigham*, 382 F.3d at 506 n.4 (citing *United States v. Childs*, 277 F.3d 947, 952–54 (7th Cir. 2002) (suggesting probable cause permits more investigative actions during a stop)), it is well settled that reasonable suspicion justifies a traffic stop at its inception. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) ("For a traffic stop to be justified at its inception, an officer must have an objectively *reasonable suspicion* that some sort of illegal activity, *such as a traffic violation*, occurred, or is about to occur, before stopping the vehicle." (emphasis added)); *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("A traffic stop for a suspected violation of law is a 'seizure of the occupants of the vehicle . . . . All parties agree that to justify this type of seizure, officers need only 'reasonable suspicion' . . . ."); *United States v. Spears*, 636 F. App'x 893, 899 (5th Cir. 2016) ("[W]e find stopping Spears's vehicle was initially justified by a reasonable suspicion that he had committed a traffic violation."); *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (describing step one under *Terry* as "whether stopping the vehicle was initially justified by reasonable suspicion").

[5] The Texas Transportation Code, Section 544.010(c) states:

> An operator required to stop by this section shall stop at a clearly marked stop line. In the absence of a clearly marked stop line, the operator shall stop before entering the crosswalk on the near side of the intersection. In the absence of a clearly marked stop

Transportation Code Section 545.104(b).[6] Observing either of these traffic violations undoubtedly lends an officer reasonable suspicion—and even probable cause—sufficient to justify a traffic stop. Trooper Moroles's reasonable suspicion was based on her clear view of Montes's vehicle while driving. She witnessed Montes stop directly on top of the stop line and estimated that his turn signal did not appear at least 100 feet prior to turning. ECF No. 41 at 16–17.

Defendant, however, argues no reasonable suspicion accrued from Trooper Moroles's observations because, according to Defendant, neither violation in fact occurred.[7]

**II. The Trooper's reasonable suspicion did not reflect an unreasonable mistake of fact or law.**

Defendant contests Trooper Moroles's reasonable suspicion for both violations. First, he argues the stop line was not "clearly marked," so his failure to stop behind it did not violate Texas law. Second, he argues he began signaling more than 100 feet prior to turning, so neither did he violate that provision. Without an actual violation, Defendant argues, there can be no reasonable suspicion. ECF No. 25 at 3. But that's not quite right.

Mistakes do not disqualify an officer's conclusions unless they are *unreasonable.* This rule follows from the Fourth Amendment's textual demand for reasonableness. *See Heien*, 574 U.S. at 60 ("As the text indicates and we have repeatedly affirmed, the ultimate touchstone of the Fourth Amendment is reasonableness." (quoting *Riley v. California*, 573

line or crosswalk, the operator shall stop at the place nearest the intersecting roadway where the operator has a view of approaching traffic on the intersecting roadway.

[6] Section 545.104(b) of the Texas Transportation Code provides: "An operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn."

[7] Counsel for both Defendant and the Government repeatedly argued the existence (or nonexistence) of "probable cause" in their written briefs and oral arguments. But, as previously explained, that is the wrong standard for the requisite *Terry* analysis. In recounting Defendant's arguments, the Court will refer to the correct legal standard.

U.S. 373, 381 (2014)) (internal quotes omitted)). Because "[t]o be reasonable is not to be perfect . . . the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 178 (1949)).

Therefore, "seizures based on mistakes of fact can be reasonable." *Id.* at 61. So too can "mistakes of law" remain "compatible with the concept of reasonable suspicion." *Id.* at 61. Whether fact or law, "[t]he officer may be reasonably mistaken on either ground" without offending the Fourth Amendment. *Id.* But to justify reasonable suspicion (or probable cause), "the mistakes must be those of reasonable men." *Brinegar*, 338 U.S. at 176.

Defendant offers two cases in support of a contrary view: that "a police officer's subjective belief that a motorist is in violation of state traffic laws is insufficient to justify a stop of a vehicle if that subjective belief is incorrect." ECF No. 25 at 3. First, Defendant cites *United States v. Lopez-Valdez*. 178 F.3d 282, 288 (5th Cir. 1999). That case involved an officer's mistaken belief that a cracked taillight emitting both yellow and red light violated Texas law, while in fact the statute unambiguously prohibited no such thing. *Id.* at 288. Indeed, a case from the Texas Court of Criminal Appeals had long decided the issue. *Id.* (citing *Vicknair v. State*, 751 S.W.2d 180, 187 (Tex. Crim. App. 1986, no pet.)). Given these circumstances, not only was the officer mistaken, but the Fifth Circuit found "no well-trained Texas police officer could reasonably believe that white light appearing with red light through a cracked red taillight lens constituted a violation of traffic law." *Id.* at 289. In other words, the mistake was unreasonable.

Second, Defendant cites the Fifth Circuit case *United States v. Granado*. 302 F. 3d at 423. There, the court held a traffic stop was unreasonable when the officer's belief that "the lack of a front license plate or the 'obscured' rear license plate violated Texas law" should

have dissipated as he approached the vehicle. *Id.* Though the Fifth Circuit did not cite the *Terry* framework, the opinion indicates the officer's chief mistake was impermissibly continuing the stop after it became evident there was no violation. *See id.* Upon approach, the officer determined the van "was not registered in Texas, so the lack of a front license plate," was clearly not a violation. *Id.* That meant "the only potential justification for the continued stop [was] that the license plate was obscured in violation of Texas law." *Id.* But the Fifth Circuit noted "[t]he statute is specific in what it prohibits," and nothing obscured the license plate, let alone to a degree that would interfere with its readability. *Id.* at 424. The Fifth Circuit's holding implied that any reasonable officer would have immediately determined there was no violation. Because of that implication, the focus on the stop's *continuation,* and subsequent clarifications in Fourth Amendment doctrine, *see, e.g., Heien,* 574 U.S. at 61, *Granado* hardly supports Defendant's sweeping contention. *See* 302 F. 3d at 423.

Instead, read in their entirety and against the backdrop of intervening Fifth Circuit and Supreme Court precedent, these cases more readily stand for the uncontroversial principle that *unreasonable* mistakes will not support a stop. The assertion that no reasonable suspicion may arise from mistaken facts sweeps too far. While a mistake of fact or law "cannot justify either the imposition or the avoidance of criminal liability, it does not follow that [it] cannot justify an investigatory stop." *Heien,* 574 U.S. at 67. Even under Defendant's preferred cases, the relevant question is whether the officer's belief regarding a violation, mistaken or not, was *reasonable.*

*A. The Stop*

Trooper Moroles reasonably believed Montes failed to stop where the law required. The Court need not decide whether the faded-but-visible line was "clearly marked" within the meaning of Texas law, so long as Trooper Moroles reasonably believed it was. Here, her

belief rested upon personal experience at The Intersection, knowledge of similar stops, and first-hand observations on March 20, 2026, as she relayed through live testimony at the suppression hearing.

At the time she executed the traffic stop, Trooper Moroles knew The Intersection had a white stop line. She knew, from observation, that Montes stopped on top of the line, rather than behind it. She saw the white paint comprising the stop line while approaching The Intersection, and then again after Montes pulled forward. She previously conducted stops at that intersection for failure to stop, and she knew other officers had recently initiated similar stops as well. At the time of the stop, the line was in at least as good a condition as it was on April 22, 2026, when Investigator Castanon photographed it. Even in late April, when the line was likely more faded than on March 20, 2026, Investigator Castanon could see the line from at least 50 feet away. Based on these facts, the Court cannot say Trooper Moroles's belief that Texas law required Montes to stop behind the line was unreasonable. Quite the opposite, the Court finds Trooper Moroles's belief that she witnessed a violation of Section 544.010(c) of the Texas Transportation Code was entirely reasonable—perhaps even correct.

The Court finds support in *United States v. Davis*. 308 F. App'x 851, 855 (5th Cir. 2009). There, the Fifth Circuit upheld the constitutionality of a traffic stop when:

> "[The officer] testified that the *rear wheels* of the vehicle were over the solid white line, and the exhibits admitted during the suppression hearing show[ed] a distinct, though partially faded, stop line that could have been visible to both the driver and the to police officer following behind. Whatever the state of the stop line, [the officer] described the commission of what was at least 'arguably' a violation of the state statute.

*Id.* Here, as in *Davis*, Trooper Moroles (1) observed Montes's car stop on top of the line, with part of the vehicle past the line and (2) exhibits from the hearing showed the line "could have been visible" to both Montes and Trooper Moroles. As such, Trooper Moroles witnessed "what was at least 'arguably' a violation of the state statute." *Id.*

The factual similarities in *Davis* cut directly against Defendant's analogy to *Lopez-Valdez*. 178 F.3d at 288. And Defendant's arguments under *Granado* fare no better. *See* 302 F. 3d at 423. Even assuming Trooper Moroles was mistaken, unlike in *Granado*, a brief investigation would not have alerted her to the mistake. *See id.* Therefore, *Davis* is the most analogous case—and it favors the Government. *See* 308 F. App'x at 855.

For these reasons, the Court finds Trooper Moroles had reasonable suspicion to initiate the traffic stop based solely on the apparent violation of Texas Transportation Code Section 544.010(c). As such, the stop passes muster under the *Terry* analysis, specifically step one. Because Defendant does not argue that the stop continued for an unreasonable duration or that the search itself violated the Fourth Amendment, this concludes the Court's analysis. The Court finds the stop comported with constitutional requirements and any evidence obtained as a result should not be suppressed.

*B. The Signal*

Although the apparent failure to stop independently justified the stop, the Court nevertheless addresses the Government's alternative justification: Montes's apparent failure to signal at least 100 feet prior to turning. This presents a closer question.

The testimony and exhibits offered at the hearing showed Trooper Moroles thought she witnessed a violation of Section 545.104(b) of the Texas Transportation Code. From her perspective, it appeared Montes did not signal at least 100 feet prior to turning. ECF No. 41 at 16–17. Referring to the footage captured by her dashcam in Government's Exhibit 1, *see* ECF No. 39, she identified the moment Montes began to signal. ECF No. 41 at 17. She testified that she thought the car was more than 100 feet from The Intersection at that time. *Id.* at 16.

Investigator Castanon cross-referenced Trooper Moroles's dashcam footage to estimate the distance from the intersection at which Montes began signaling. According to

Investigator Castanon's account, Montes signaled his turn approximately 122.5 feet prior to The Intersection. *Id.* at 63. Defendant argues a 22.5-foot error goes beyond the bounds of reasonableness. *Id.* at 84.

Considering "totality of the circumstances . . . not . . . in isolation from each other," the Court cannot conclude Trooper Moroles made an *unreasonable* mistake. *Lopez-Moreno*, 420 F.3d at 430. There are three reasons for this. First, a vehicle traveling only 15 miles per hour will cover a distance of 22 feet in a single second. That means the difference between Officer Moroles's determination and the point at which Montes would have violated the Texas statute might have been a mere second or less. *Cf Graham v. Connor*, 490 386, (1989) (noting "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving" in the context of qualified immunity).

Second, the road approaching The Intersection curves to the left (from the perspective of Trooper Moroles). *See* Ex. 1 at 1:21–40. The road's curvature adds a complicating factor to any distance estimates. Not only did the approximately 22.5-foot error reflect a mere second's difference, but that second included travel along the curve. As the Court noted at the hearing, while comparing vantage points along the curve, "[b]ecause of the curvature . . . you can see why the difference between 100 feet versus 122 feet is more difficult to discern from the perspective" Trooper Moroles had at the time. ECF No. 41 at 101. Simply "eyeballing" the distance became a much more difficult task in these conditions.

Third, at the time Montes initiated his turn signal his brake lights were also operating. *See* Ex. 1 at 1:29–1:33. The combined illumination of the brake lights and turn signal exacerbated the difficulty of determining when the signal began, and how far from The Intersection the vehicle was at that moment. As the Government argued, even reviewing the dashcam footage, "it is hard to see whether that turn signal is on." ECF No. 41 at 101.

For these reasons, the Court finds Trooper Moroles's mistake was reasonable under the circumstances. She made a split-second distance estimate about a moving target, while following on a curve, with multiple lights illuminated. As such, her belief that Montes failed to signal at least 100 feet in advance gave her an *additional* basis for reasonable suspicion. Even if she had not witnessed Montes's apparent failure to stop behind The Intersection's stop line, her observations and conclusions about Montes's turn signal would have justified the traffic stop.

## CONCLUSION

A traffic stop is justified by reasonable suspicion of illegal activity. Trooper Moroles witnessed two apparent traffic violations before stopping Montes. Because Trooper Moroles's reasonable suspicion did not reflect an unreasonable mistake of fact regarding either violation, the brief detention did not offend the Fourth Amendment. The Court accordingly **DENIES** the Motion.

**SO ORDERED.**

August 5, 2026.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE